UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DEBRA JEAN BISHOP,

    Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Case No. 3:24-CV-271 JD

**OPINION AND ORDER**

Plaintiff Debra Bishop appeals the denial of her claims for disability insurance benefits under Title II of the Social Security Act. For the reasons below, the Court will affirm the Commissioner's decision.

**A. Background**

Ms. Bishop applied to the Social Security Administration for disability benefits, alleging that she became disabled in January 2022. She was then 58 years old. Ms. Bishop claimed disability based on her left arm pain, knee replacement, high blood pressure, and back pain. (R. at 79, 88.) Ms. Bishop's claims were rejected, leading to a review by an Administrative Law Judge ("ALJ").

In the proceedings before the ALJ, Ms. Bishop maintained that she sustained a shoulder injury in late 2021, resulting in pain and reduced mobility, diagnosed as adhesive capsulitis and a partial supraspinatus tear. Despite steroid injections and physical therapy, she continues to experience discomfort. Her right knee was replaced in 2020, and she now suffers from osteoarthritis in her left knee, managed with medication and injections. Additionally, she has

plantar fasciitis and carpal tunnel syndrome, for which she uses pain medication and wrist splints. A consultative exam in May 2022 revealed ongoing pain and stiffness in her left shoulder, right knee, and back, with difficulty moving her left arm and walking. The exam showed a BMI of 37.3 and limited ability to ambulate effectively.

The ALJ issued a decision finding that Ms. Bishop was not disabled. (R. at 34.) In doing so, the ALJ employed the customary five-step analysis. At Step 2, the ALJ determined that Ms. Bishop suffered from the following severe impairments: "left shoulder adhesive capsulitis/small tear; left knee internal derangement; history of right knee arthroplasty; and obesity." (R. at 27.) On the other hand, the ALJ ruled that Ms. Bishop's right foot plantar fasciitis and carpal tunnel syndrome ("CTS") were non-severe impairments. (*Id.*)

At Step 4, the ALJ determined Ms. Bishop's residual functional capacity ("RFC"), finding that she can

> perform sedentary work[1] . . . except no climbing ladders, ropes, and scaffolds; occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and balance; occasionally reach overhead with non-dominant left upper extremity; and frequently handle and finger bilaterally.

(R. at 28.)

In light of this RFC, the ALJ determined that Ms. Bishop is capable of performing past relevant work as a collection clerk. (R. at 34.) The ALJ arrived at this conclusion after questioning a Vocational Expert at the hearing.

After the Appeals Council denied Ms. Bishop's request for review of the ALJ's decision, she appealed to this Court.

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.

B.     **Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.

3

2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**C.  Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1.  Whether the claimant is currently engaged in substantial gainful activity;
2.  Whether the claimant has a medically severe impairment;
3.  Whether the claimant's impairment meets or equals one listed in the regulations;
4.  Whether the claimant can still perform past relevant work; and
5.  Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity,

4

which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**D. Discussion**

**(1)** *Playing Doctor*

Ms. Bishop accuses the ALJ of "playing doctor," that is, interpreting medical evidence on his own, without the benefit of a medical opinion.

"An ALJ may not 'play doctor' by substituting his opinion for that of a physician." *Seamon v. Astrue*, 364 F. App'x 243, 247 (7th Cir. 2010) (quoting B*lakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2005)). That is to say that an ALJ may not "interpret 'new and potentially decisive medical evidence' without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)). "Typical cases of ALJs impermissibly 'playing doctor' are when they either reject a doctor's medical conclusion without other evidence, or when they draw medical conclusions themselves about a claimant without relying on medical evidence." *Back v. Barnhart*, 63 F. App'x 254, 259 (7th Cir. 2003) (citations omitted).

5

As strange as her argument may be, Ms. Bishop believes that the ALJ played doctor because he considered both evidence of abnormal and normal medical findings and determined that the evidence of normal findings outweighed the abnormal ones. (Pl.'s Br., DE 13 at 11.) For example, in reviewing medical evidence, the ALJ considered imaging results and examination reports and testing. He observed that an MRI of the left shoulder showed an oblique tear through the supraspinatus myotendinous junction and an x-ray of the knees showed mild joint effusion in both knees. Office exams showed a reduced range of motion of the left shoulder with a positive arm drop, reduced strength and positive Neer's and Hawkins' tests, as well as reduced range of motion in both shoulders and knees. In addition, Ms. Bishop had right antalgic gait, lower lumbar tenderness and stiffness and pain with lumbar extension. (*Id.* (citing R. 30–32).) At the same time, the ALJ noted that her exams and testing showed that she had normal pulmonary and cardiovascular systems, normal posture, one unremarkable left shoulder x-ray, normal range of motion of the lumbar spine, normal muscle tone and a negative straight leg raise. Citing *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014), she declares that "[t]he Seventh Circuit has remanded similar cases for exactly this reason." (Pl.'s Br., DE 13 at 12.)

But Ms. Bishop has not shown that the ALJ rejected a doctor's conclusion without other evidence or drew his own conclusion without relying on medical evidence. *See Back*, 63 F. App'x at 259 (7th Cir. 2003) (citations omitted). Rather, the ALJ did what the ALJs must do: he considered all evidence and weighed it. He found that medical imaging and tests showed she had certain limitations, but those limitations did not affect Ms. Bishop as severely as she claims. Moreover, contrary to Ms. Bishop's claim, the ALJ did not find that normal findings completely outweighed the abnormal ones. If that were the case, the RFC would have no restrictions on

6

climbing ladders, ropes, scaffolds and so on, or a restriction for reaching overhead. Essentially, Ms. Bishop is asking the Court to reweigh the evidence, something it is not permitted to do.

Nor has Ms. Bishop shown that the ALJ interpreted new evidence that has not been subjected to medical review. She points to the MRI report that diagnosed Ms. Bishop with a left shoulder adhesive capsulitis and rotator cuff tear as being such evidence, but the report was reviewed by Ms. Bishop's doctor, Tyler McGregor. (R. at 30.) Yes, the ALJ noted the MRI report in the decision, but nowhere does the ALJ appear to be interpreting on his own the meaning of this report. Rather, the ALJ states that after undergoing the MRI, Ms. Bishop saw Dr. McGregor, who examined her and believed that her "history, physical exam, and imaging were consistent with the diagnosis of left adhesive capsulitis with partial thickness supraspinatus tearing, and possible cervical radiculopathy." (R. at 30.) Dr. McGregor also diagnosed her with a left partial thickness rotator cuff tear. At the visit, Ms. Bishop "elected to continue conservative treatment, including an ultrasound guided intra-capsular injection." Dr. McGregor referred her to physical therapy and advised use of NSAIDs. In addition, state agency medical consultant, Dr. J.V. Corcoran, considered the same MRI report and found Ms. Bishop capable of carrying up to ten pounds occasionally, and less than ten pounds frequently, in line with sedentary work, and did not have any other restrictions on the use of her arms. The ALJ credited Ms. Bishop's own reports of her reaching limitations in finding Dr. Corcoran's opinion not fully persuasive and adding in the RFC greater limitations on the use of her shoulder. The ALJ's assessment, including his limitation on Ms. Bishop's ability to reach, does not in any way suggest that he was usurping a doctor's role. Ms. Bishop also accuses the ALJ of playing doctor because he noted in his decision that her obesity "could put pressure on her knee joints." (Pl.'s Br., DE 13 at 12.) But the ALJ's observation is favorable to Ms. Bishop. It would be another matter if he declared

without evidence that Ms. Bishop's obesity did not aggravate her knees, but here his acknowledgment is consistent with common sense and regulations. *See* SSR 19-2p, Evaluating Cases Involving Obesity (May 20, 2019) ("The combined effects of obesity with another impairment(s) may be greater than the effects of each of the impairments considered separately. For example, someone who has obesity and arthritis affecting a weight-bearing joint may have more pain and functional limitations than the person would have due to the arthritis alone. We consider all work-related physical and mental limitations, whether due to a person's obesity, other impairment(s), or combination of impairments."). Moreover, a case upon which Ms. Bishop relies, *Barrett v. Barnhart*, 355 F.3d 1065 (7th Cir. 2004), is inapplicable. In *Barrett*, the Court of Appeals could not tell on what basis the ALJ decided that the plaintiff, who was obese, could stand for two hours at a time: "No physician said that. A great many people who are not grossly obese and do not have arthritic knees find it distinctly uncomfortable to stand for two hours at a time. To suppose that [the plaintiff] could do so day after day on a factory floor borders on the fantastic, but in any event has no evidentiary basis that we can find." *Id*. at 1068. Here, the ALJ found that Ms. Bishop is only capable of performing sedentary work and did not overlook her obesity in the overall consideration of the evidence.

      Finally, Ms. Bishop's reliance on *Goins* is misplaced. In *Goins*, the plaintiff submitted an MRI result that seriously contradicted a consulting physician's opinion, but the ALJ blindly followed the consultant's opinion anyway and, more importantly, attempted to interpret the MRI result herself. 764 F.3d at 680. Here, however, the ALJ did not interpret the MRI on his own. At most, he merely restated what the MRI report said, without providing any "mumbo jumbo" under the guise of relying on evidence to support his conclusion. For all these reasons, there's no error in the ALJ's assessment of the medical evidence.

### (2) *Ms. Bishop's Use of a Cane*

Ms. Bishop submits that, although she has used a cane, this limitation is not provided for in the RFC which requires a remand.

Ms. Bishop cites SSR 96-9p for the proposition that the ALJ must consider even periodic use of a cane but disregards the fact that she has presented no evidence that she is medically required to use a cane. "To find that a hand-held assistive device is medically required, *there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing and describing the circumstances for which it is needed* (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded." SSR 96-9p, Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work, 1996 WL 374185, at *7 (July 2, 1996) (emphasis added); *see also Tripp v. Astrue*, 498 Fed. App'x 951, 955 (7th Cir. 2012) ("A finding of necessity must rest on 'medical documentation establishing the need for a hand-held assistive device to aid in walking and standing, and describing the circumstances for which it is needed' . . . .") (quoting SSR 96–9p); *Joseph M. v. Saul*, No. 18 C 5182, 2019 WL 6918281, at *12 (N.D. Ill. Dec. 19, 2019) ("That an individual may use a cane does not necessarily warrant a corresponding RFC restriction. Rather, to justify a cane RFC restriction, the individual must show that a cane is a medical necessity and under which circumstances the cane is medically necessary. Because [the

9

plaintiff] has not done so, the ALJ's decision not to include a cane RFC restriction was not erroneous.").

Also, Ms. Bishop insists that the ALJ did not consider her need for a cane, but that's not true. As the ALJ explained, although there were some mild abnormal findings, and although Ms. Bishop stated in her functional report and at some doctor appointments that she used a cane, her medical records did not reflect any joint instability in her left knee or weakness. (Tr. 32, 470–81, 571–74, 582–89). And the only person to opine on the matter was consultative examiner Dr. Stephen Parker who did not think that a cane was medically necessary. (R. at 31.) Ms. Bishop challenges Dr. Parker's conclusion because he observed her walking with right antalgic gait when using her cane but she has not shown that his opinion is so inconsistent that the ALJ could not rely on it. After all, Dr. Parker's examination showed that she could carry light weights, her posture was normal, and she had the ability to ambulate effectively as "low normal." (R. at 31, 476.) Besides, she had full strength, normal muscle tone, and sensation, even though she suffered from left shoulder pain and stiffness and right knee pain. The ALJ therefore explained how he weighed this evidence in finding Plaintiff's cane was not medically required. Accordingly, Ms. Bishop's argument regarding her use of a cane does not warrant a remand.

**(3)** *Restriction to Frequent Handling and Fingering*

The ALJ determined that Ms. Bishop's CTS was a non-severe impairment. (R. at 27.) Ms. Bishop argues that the ALJ erred by failing to explain how the restriction in the RFC to frequent handling and fingering supports Ms. Bishop's limitations related to her CTS. In essence, though, Ms. Bishop complains of not being limited to occasional handling and fingering, which

would have eliminated her past work as a collection clerk,[2] the occupation that the ALJ determined she could perform.[3]

The ALJ must determine an individual's RFC, meaning "what an individual can still do despite his or her limitations," SSR 96–8p, based on medical evidence as well as other evidence, such as testimony by the claimant. *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). In making a proper RFC determination, the ALJ must consider all the relevant evidence in the record, even as to limitations that are not severe. *Id.*; *see* 20 C.F.R. § 404.1529(a) (in making a disability determination, the ALJ must consider all of a claimant's symptoms, including pain, and how those symptoms affect a claimant's daily life and ability to work). The ALJ must then build "an accurate and logical bridge from the evidence to the conclusion" so that a court can assess the validity of the agency's decision and afford the claimant meaningful review. *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007). The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

It must be underscored, however, that "a claimant bears the burden of proving their disability." *Thorlton v. King*, 127 F.4th 1078, 1080 (7th Cir. 2025). "Establishing the existence of an impairment is not enough. The claimant must present evidence of limitations affecting their capacity to work." *Id*. at 1081; *see Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022) (noting that the plaintiff bore the burden "to come forward with medical evidence to establish

---

[2] The work of a collection clerk requires frequent fingering and occasional handling. DOT No. 241.357-010, 1991 WL 672249.

[3] At the hearing, once the VE testified that the hypothetical person with Ms. Bishop's RFC could perform her past work, the ALJ did not inquire whether there are other jobs in significant numbers in the national economy that Ms. Bishop could do. (*See* R. at 74–75.)

that her tachycardia would impede her ability to do sedentary work or that it required any limitations beyond those set forth by the ALJ in his hypothetical question.").

> Oftentimes a claimant can satisfy that burden by, for example, asking their "doctor to lay out in plain language exactly what it is that the claimant's condition prevents" them from doing, [*Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011)], or presenting testimony about the effect of their symptoms that is consistent with the objective medical evidence. *See* 20 C.F.R. § 404.1529(a), (c)(3)–(4). The administrative process, in short, provides a claimant with ample opportunity to raise various limitations and offer evidence to support them. *See, e.g., id*. § 404.1513(a)(2) (allowing a claimant to provide "a statement from a medical source about what [the claimant] can still do despite [their] impairment(s)"); *id*. § 404.1545(a)(3) ("We will consider any statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations."); *id*. § 404.929 (providing the opportunity to present new evidence, including their own testimony, at a hearing before an ALJ).

*Thorlton*, 127 F.4th at 1081.

In reviewing a disability benefits appeal, the courts must affirm "so long as the ALJ's decision finds support in 'substantial evidence.'" *Id*. That's a highly deferential standard: "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103, 139 S.Ct. 1148, 203 L.Ed.2d 504 (2019). "Put most simply, we will reverse an ALJ's decision only if the record 'compels a contrary result.'" *Thorlton*, 127 F.4th at 1081 (quoting *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021)).

In support of her argument that the ALJ should have imposed a more restrictive handling and fingering limitation, Ms. Bishop points to several medical records related to the diagnosis of her CTS. (*See* Pl.'s Br, DE 13 at 17 ("[T]he record shows longitudinal findings of tingling in the fingers with positive Phalen's and Tinel's testing, a need for bilateral wrist cock-up splints to be worn at night for hand numbness, persistent numbness in her right thumb, and weakness in both hands." (citing to R. at 472, 583, 587, 589).) But these records are not evidence of limitations

affecting Ms. Bishop's capacity to work. *See Shaun R. v. Saul*, No. 18 C 4036, 2019 WL 6834664, at *9 (N.D. Ill. Dec. 16, 2019) ("It bears repeating that diagnosis is not the same as disability."). Lacking from Ms. Bishop's submission are any statements from medical professionals as to what Ms. Bishop's condition prevents her from doing. And the only medical opinion regarding handling and fingering is from consultative examiner Dr. Stephen Parker who did not include any limitations regarding handling and fingering. Although Dr. Parker mentioned potential difficulty with some handling and fingering tasks "because of weakness in both hands possibly due to carpal tunnel," his exam reflected that Plaintiff had full grip strength in both hands, normal sensation, normal ability to pinch, grasp, make a close fist, oppose the fingers, and normal range of motion in her wrists. He also found that Ms. Bishop can repetitively pick up a coin, button a shirt, zip a zipper, tie shoes, open a jar, pick up keys, write with a pencil, grip and grasp objects, and shake hands. (R. at 472, 477, 478–79.) The ALJ found "Dr. Parker's opinion generally persuasive, but [] added additional limitations, when considering the claimant's shoulder impairment and mild bilateral CTS." (R. at 34.) In short, Ms. Bishop has not identified medical evidence of limitations affecting her capacity to work beyond what the ALJ found.

Next the Court considers Ms. Bishop's own testimony about the effect of her symptoms on her ability to work. She testified that she has difficulty with running a sweeper "because of [her] wrists. They're getting a lot worse and they're starting to affect my everyday things, but I can't get them fixed because of my insurance right now." (R. at 48.) She said she's been seeing Dr. Tiburzi for her wrist and he asked her to have a surgery and referred her to a surgeon, but she has had to put off the appointment because her husband needed three surgeries himself and she had to take care of him. (*Id.*) Also, Dr. Tiburzi no longer accepts her health insurance, so she had to schedule an appointment with someone else. (R. at 49.) Meanwhile, Dr. Tiburzi told her to go

13

to the hospital or MedPoint[4] if she's in pain. (*Id*.) Ms. Bishop also testified that she can't work because carpal tunnel is very painful. She has difficulty doing everyday things and she's wearing night splints that the doctor has ordered. (R. at 60.) The splints "help a little bit" and she started to wear them during the day. (*Id.*) She takes over-the-counter medications, but it helps only a little. (R. at 61.) The ALJ asked her if she has problems with hands and fingers, and Ms. Bishop answered that "using my hands is a very difficult situation." (R. at 66.) She said she can button buttons, zip, tie, feed herself, cut up food, wash and brush her hair, and use cell phone. (R. at 66–67.) She said she can write down a grocery list, "but that's about it." (R. at 71.) She can do chores for ten minutes before pain sets in. (*Id*.)

But regardless of whether the Court believes that Ms. Bishop's testimony establishes that handling and fingering should be more restrictive than assigned by the ALJ, the Court cannot reweigh evidence. In finding that she should be limited to frequent handling and fingering, the ALJ considered both medical evidence and Ms. Bishop's testimony. In fact, he accurately recounted Ms. Bishop's testimony in his decision, even recognizing her worsening pain, and on the basis of this testimony added a limitation to her handling and fingering abilities. (R. at 27–28.) The ALJ found that Ms. Bishop's "treatment notes showed mild findings on physical examination and recommended conservative treatment plan," but the handling and fingering limitations were needed in the RFC given her "complaints of hand/wrist pain and numbness as well as some manipulation." (R. at 28.) Although Ms. Bishop argues that the ALJ improperly ignored her explanation for why she did not pursue additional treatment for CTS, the characterization is wrong. The ALJ recognized this testimony for what it was, and there's no indication that he misconstrued it. Whether in this context or in her overall testimony, Ms.

---

[4] MedPoint is an urgent care clinic. (R. at 549.)

Bishop does not point to any evidence that the ALJ failed to consider. "In short, this is not a case where the ALJ presented a 'skewed version of the evidence,' *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014), or failed to 'minimally discuss' contrary evidence, *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000), so reversal is not warranted on this ground." *Thorlton*, 127 F.4th at 1082. What's more, "[t]he lack of an opposing medical opinion [imposing greater restrictions than those the ALJ found in his decision] makes it difficult for us to find that the ALJ misjudged the evidence so significantly as to warrant reversal. *Tutwiler v. Kijakazi*, 87 F.4th 853, 860 (7th Cir. 2023); *see also Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. Aug. 13, 2010) (finding no error where "[i]t was because of and not in spite of [the plaintiff's] testimony that the ALJ limited her to a more restrictive residual functional capacity finding than any physician on the record").

### (4) *Ms. Bishop's Mental Impairments*

Ms. Bishop argues that the ALJ did not account in the RFC for her mental impairments. But in making her case, Ms. Bishop primarily relies on her subjective reports, which the ALJ considered in fashioning the RFC, and she largely overlooks that substantial evidence supports the ALJ's conclusion.

The ALJ did not ignore Ms. Bishop's testimony about depression. He recognized her testimony (she felt that the main reason she cannot work is because of her depression and anxiety; she does not want to get out of bed because she is depressed and in pain; Dr. Tiburzi, gives her the mental health medication which helps a little) and incorporated it in his decision. Importantly, the ALJ did not find that Ms. Bishop had not been diagnosed with depression; rather, the ALJ's finding was that "there is no support in the record for any functional limitations

15

from depression, anxiety, or any other mental impairment." (R. at 33.) The ALJ noted the lack of evidence supporting her claim, as well as the fact that Ms. Bishop did not allege depression or anxiety in her disability filing. And, although she was prescribed medication by Dr. Tiburzi, she did not receive specialized mental health treatment. (R. at 33, 57–59). In fact, she was not seeing a therapist or psychiatrist and had not seen a mental health specialist for more than 20 years.[5] (Tr. 29, 57-59). Further, Ms. Bishop denied depression and anxiety at her recent office visit and her mental status exam reflected normal affect, euthymic mood, good eye contact and grooming, logical and linear thought content, and fair insight. (R. at 33, 587). Dr. Tiburzi noted that she was then not taking any mental health medication and did not want to start any.[6] (*Id.*) In weighing this evidence, the ALJ found that it did not support any mental health limitations. (R. at 33). In a real sense, the ALJ was comparing "apples to apples"—that is Ms. Bishop's statements about the alleged mental impairments at the hearing and her statements to her doctor on the same subject. *See Seamon v. Astrue*, 364 F. App'x 243, 250 (7th Cir. 2010) ("ALJ may not ignore a claimant's subjective reports of pain or mental impairments simply because they are not fully supported by objective medical evidence, but discrepancies between objective evidence and self-reports may suggest symptom exaggeration.") (citing *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005)). Under the minimal requirements, the ALJ said enough to support his decision and permit

---

[5] Ms. Bishop argues the ALJ rejected her mental impairments because only her primary care doctor prescribed her medication. (Pl.'s Br., DE at 19). The Court disagrees. While the ALJ may not demand that the plaintiff receive care from a particular medical provider, the ALJ may consider the extent of the care that the plaintiff received, which is what happened here. *See, e.g.*, *Upton v. Comm'r of Soc. Sec.*, 1:23-CV-142. 2024 WL 2890793, at *5 (N.D. Ind. June 10, 2024) (ALJ appropriately found Plaintiff less limited than did state agency psychologists based on lack of psychiatric hospitalization, lack of counseling, no psychiatric medications, full range of daily activities, and part-time work).

[6] In her brief, Ms. Bishop points to this visit and submits that she reported to Dr. Tiburzi "feeling depressed 'all the time.'" (Pl.'s Br., DE 13 at 19–20 (citing R. at 587).) However, she misinterprets the visit record. The phrase "all the time" refers to the doctor's note for the need for depression screening. In fact, right next to that entry, the record states, "not on medication and does not want to start medication," and just above, under the "review of systems," the doctor noted, "No anxiety or depression." (R. at 587.)

meaningful appellate review, *see Thorlton*, 127 F.4th at 1083 ("Could the ALJ have done and said more? Yes, and that is what makes this case difficult. But multiple times over 'we have emphasized that social-security adjudicators are subject to only the most minimal of articulation requirements.'"), and his findings is based on substantial evidence, *see Richardson*, 402 U.S. at 401 (substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

In countering the ALJ's decision, Ms. Bishop points to her reports of fatigue and her obesity and wants the Court to construe them as symptoms of depression. Ms. Bishop relies on a report where she told her doctor that she was depressed, overweight, and tired, but she cites no medical evidence or statement from any doctor linking the depression to obesity and fatigue. Ms. Bishop's generic indication that obesity and fatigue may affect mental impairments offers nothing to show it did so here. In fact, contrary to Ms. Bishop's theory, Dr. Tiburzi was concerned that Ms. Bishop's obesity and fatigue were related to "estrogen deficiency and possibly menopausal in nature."[7] (R. at 588.) Ms. Bishop's lay hypothesis, unsupported by the record, is not a valid basis for remand; rather, it is an invitation to "play doctor," which neither the ALJ nor the Court is permitted to do. Substantial evidence supports the ALJ's decision to not include mental functional limitations in the RFC. *See Karr v. Saul*, 989 F.3d 508, 512-13 (7th Cir. 2021) (where plaintiff failed to present evidence supporting disabling functional limitations, her appeal "amounts to a failure of proof" because plaintiff "bears the burden of proving that she is disabled.").

---

[7] The Court points this out not to say Dr. Tiburzi is right and Ms. Bishop is wrong, but to demonstrate that her argument is speculative. The speculative nature of the argument is further underscored by Ms. Bishop quoting only the initial line of Dr. Tiburzi's note—"[o]ne of [Plaintiff's] biggest concerns is her fatigue . . . she reports that she has been seen for fatigue multiple times and nothing has been done" (Pl.'s Br., DE 13 at 20 (quoting R. at 588)—–and failing to include the rest of the note, which states his "concern that this is possibly related to estrogen deficiency and possibly menopausal in nature" (R. at 588).

**(5)** *Subjective Symptoms Analysis*

Ms. Bishop claims that the ALJ's subjective symptoms analysis requires a remand for two reasons. First, the ALJ erred by making his medical findings without the benefit of medical experts—i.e., by playing doctor—and then used those findings to discredit Ms. Bishop's allegations of pain. Second, the ALJ used Ms. Bishop's "conservative" treatment for her CTS to find her less limited than warranted.

The Court has already addressed Ms. Bishop's contention that the ALJ played doctor, so it need not repeat itself. Had he done so, this case would already be on its way for remand. And insofar as Ms. Bishop may be suggesting that the ALJ should not have considered her medical reports in considering her subjective allegations, the law does not support her. Under the regulations, the ALJ is specifically directed to consider a claimant's objective medical records in considering her subjective reports. 20 C.F.R. § 404.1529(c)(2); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) ("discrepancies between objective evidence and self-reports may suggest symptom exaggeration"). "Absent the requirement of objective medical findings, disability hearings would turn into swearing contests." *Moothart v. Bowen*, 934 F.2d 114, 117 (7th Cir. 1991).

As for Ms. Bishop's second argument, the Court finds no basis to conclude that the ALJ patently misconstrued Ms. Bishop's decision to proceed conservatively in treating her CTS. The Court gives "the ALJ's credibility finding special deference and will overturn it only if it is patently wrong." *Summers v. Colvin*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotation marks

and citation omitted). A subjective symptoms evaluation is "patently wrong" if it "lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Reviewing her June 2, 2023, visit with Dr. Tiburzi, the ALJ recognized her report to the doctor that "the wrist braces were helpful but she had some numbness in the right thumb" (R. at 27; *see also* R. at 582 ("She reports that her wrist braces have been helpful and she still has some numbness in the right thumb. Otherwise they are helping.")), and that Dr. Tiburzi "recommended that she continue to use the braces, take anti-inflammatory medications, and do her exercises" (R. at 27; *see also* R. at 583). The ALJ observed that Dr. Tiburzi stated that Ms. Bishop "declined possible follow-up referral to consider more definite management." (R. at 27; *see also* R. 583.) Immediately after that, the ALJ acknowledged Ms. Bishop's stated reasons for not pursuing more treatment—that her husband was having surgery and she needed a new primary care doctor because the doctor no longer accepted her insurance. The ALJ did not indicate that this meant that her impairments weren't as severe as she claimed. In fact, the ALJ stated that, although Ms. Bishop previously declined additional treatment, she has been experiencing worsening of CTS and "she is now seeking treatment." (R. at 27.) So, Ms. Bishop's insistence that the ALJ drew a negative inference for declining a referral to a surgeon misstates the ALJ's evaluation. Rather, the ALJ offered multiple other reasons in support of his evaluation, as discussed above. Among those was also the fact that, even though Ms. Bishop could not continue receiving care from Dr. Tiburzi, he recommended that she go to MedPoint or the ER, but she never went. (R. at 27.) Importantly, the ALJ did not say that all is well with Ms. Bishop's wrists; rather, he indicated that, based on her testimony, she needed a limitation to frequent handling and fingering. The Court cannot say that the ALJ's assessment is patently wrong. An ALJ's subjective symptom analysis is given special deference so long as the ALJ explains his reasoning

19

and it is supported by the record. The Court will not overturn an ALJ's subjective symptom analysis unless it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). Here, Ms. Bishop has failed to make such a showing.

### E. Conclusion

For these reasons, the Court AFFIRMS the Commissioner's decision. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: March 31, 2025

                                                  /s/ JON E. DEGUILIO
                                                  Judge
                                                  United States District Court